We'll hear argument next in Case 14-1373, Utah v. Strieff. Mr. Green. Mr. Chief Justice, and may it please the Court. Courts typically apply the exclusionary rule to suppress unlawfully seized evidence. The question here is whether to suppress evidence lawfully seized in a search incident to a warrant arrest because the arresting officer found the warrant in a stop later judged to be unlawful. Under this Court's attenuation analysis, such evidence is admissible when, as here, the predicate stop was not flagrant, but resulted from an objectively reasonable miscalculation. Extending the exclusionary rule- Tell me what was objectively reasonable about it? Well, Your Honor- I mean, the police officer admits that the person he saw coming out of the house in question wasn't doing anything. He didn't know that he lived there. He didn't know what he had done, if anything. He didn't even really know that there was drug dealing going on in the house. He was trying to figure that out. So what was objectively reasonable about stopping this man? Justice Sotomayor, we've admitted that this was a miscalculation, but it was a close call. If the officer here had stopped the first person coming out of the house after receiving the tip, that would have been objectively unreasonable under this Court's case and decision in Alabama v. White. But this person wasn't the first person he saw come out of the house. He'd received the anonymous tip and then had proceeded to corroborate it through three hours of surveillance and observation over the course of the ensuing week. And all the traffic he saw during those three hours was the same short-stay traffic that was reported in the tip.  activities. Sotomayor, it would be interesting if we waited to see whether this was also a short-stay visitor. I don't see how this is any different than stopping the first person you see. Well, I think, Your Honor, as we've admitted, I think if he had seen it and it were short-stay, I think we may well be to reasonable suspicion. And I think that's why the prosecutor here conceded that it wasn't. But it was a close call based on everything he had seen to that point. And in these circumstances, we think that's where the predicate conduct was the result of a misconduct that was not. Sotomayor, what's going to stop police officers, if we announce your rule, and your rule seems to be, once we have your name, if there's a warrant out on you, that's an attenuating circumstance under every circumstance, what stops us from becoming a police State and just having the police stand on the corner down here and stop every person, ask them for identification, put it through, and if a warrant comes up, searching them? I think, Justice Sotomayor, I think there are two answers to that question. First, I think that our rule, an officer can never count under our rule on finding a warrant, so there is no incentive for him to make that stop. If there's no warrant and the stop isn't lawful. Well, if you have a town like Ferguson where 80 percent of the residents have minor traffic warrants out, there may be a very good incentive for just standing on the street corner in Ferguson and asking every citizen, give me your ID, let me see your name, and let me hope, because I have an 80 percent chance, that you're going to have a warrant. Well, I understand, Your Honor, and that's the second part of my answer, is that officers can't count. Under our rule, a warrant by itself is not sufficient. There still must be a separate inquiry into whether the predicate stop was flagrant, and an officer can't count in any particular stop, on a judge later concluding that the stop was flagrant. Kagan, but I assume, Mr. Green, that there are a variety of circumstances in which police officers would really like to talk to somebody and really like to search them, but don't have reasonable suspicion. And I think that the question that Justice Sotomayor is asking is, if you're policing a community where there's some significant percentage of people who have arrest warrants out on them, it really does increase your incentive to make that stop on the chance that there will be a warrant that will allow you to search and admit whatever evidence you gained in that search. Justice Kagan, I don't think so. I think, again, if the inquiry turns, as it does, on not only finding a warrant but then a determination of whether the stop was flagrant, the officer has no guarantee before he makes the stop that the judge will later conclude that the stop was not. Kagan Well, but this is an officer who you say this is a close call. So let's say that there are close calls. But you don't think you have reasonable suspicion or you think you maybe do if you find a good judge out there, but you – there's a reason why you want to talk. So this is not a flagrant violation. This is not a dragnet search or something like that. But you – if – I mean, it does change your incentives quite dramatically, it seems to me, if you are policing a community where there is some significant percentage of people who have arrest warrants. Well, Justice Kagan, I think with respect, doesn't officers know that the only surefire way, the incentive is always to comply with the Fourth Amendment. That's the only way they can be sure that the evidence they are gathering is later used in a prosecution. That's the only way they can be absolutely sure. But here, there is some chance that they are going to find the arrest warrant and then they are going to be able to admit the evidence that they are going to get, whereas before there was none. And that some chance is not like a once in a blue moon kind of chance. In these very heavily policed areas, it's – I mean, I was staggered by the number of arrest warrants that are out on people. So it's, you know, a significant possibility that you are going to find an arrest warrant and be able to admit whatever drugs or guns or whatever it is you find. I think, Your Honor, in those circumstances, that's where the flagrancy inquiry actually does the work of deterrence. Because as this Court has explained, to be appropriate, suppression must yield appreciable deterrence. There may be some additional marginal deterrence that suppressing everything following an event like this would yield, but that's never been enough under this Court's precedence to trigger action. Sotomayor, that's enough of a deterrent to say to a police officer in this situation, you should have reasonable suspicion, you know the Fourth Amendment requires it, so before you do an intrusive act demanding identification, you do what you are permitted to do, which is just to ask the person whether they will talk to you. Don't you think that that would improve the relationship between the public and the police? Wouldn't that be the appropriate encouragement we would give if we don't let police do these things in questionable situations? Fisherman, I think that's what the existing rule and the exclusionary rule itself does. It encourages officers to comport with the Fourth Amendment. This applies only in the limited. Sotomayor, we are disencouraging them now from doing that. We are saying if you have questionable probable cause, go ahead and do it, because we are not going to make you take that extra step of just merely stopping someone and saying, will you talk to me, please. Fisherman, I don't think so, Your Honor. I think, again, because there are two predicate steps that must be, that must happen before this exception would apply. And the officer before the stop can't count on either one. That's why when we are talking about conduct here that is admittedly a violation of the Fourth Amendment, but low culpability, that's where the additional marginal deterrence that would come from suppression doesn't do its work. And with respect to the particular type of intervening circumstance here, this is a compelling intervening circumstance of the type that this Court identified in its holding in Johnson v. Louisiana. This is a case that is not suppressive. Ginsburg. Mr. Green, you make a point that a person's name is not suppressible, and evidence derived from just knowing the name is not suppressible. If you are right about that, then the police could stop anyone and say, whether I have reasonable suspicion or not, I want to know your name, and that's not suppressible. Then there's the warrant check, which you say is an intervening circumstance. So it seems that your argument is arming the police with asking every person, what is your name, and doing the warrant check. Green, Jr. Well, Your Honor, it is, of course, that's one of the purposes of a Terry stop, of an investigatory stop, is to try to find a person's name that would confirm this bill. That's correct. That's correct. But this is a case where you're telling us reasonable suspicion or not, the name, a person's name, is not suppressible. That's right, Your Honor. But it is admittedly the but-for link between the initial predicate, unlawful stop, and the later discovery of the warrant, and the arrest on the warrant, which is the intervening circumstance. That's why, Your Honor, we think this is this falls comfortably within this Court's prior attenuation jurisprudence. Just like that. So what is an intervening circumstance, in your view? What is your test for what it is? Your Honor, we think under its – it flows naturally from this Court's teaching in Wong Sung. That is, it's any means sufficiently distinguishable from a predicate unlawful act, such that suppressing evidence seized after it would not yield appreciable deterrence. And this Court's case is having that. Okay. So your view is that we should look at the question of whether something is an intervening circumstance through the deterrence lens. That makes a lot of sense. We look at everything through a deterrence lens with respect to the exclusionary rule. And the – you know, what we're supposed to say is this – does this appreciably increase deterrence or not. Is that correct? That's the inquiry, Your Honor, yes. And I – so I guess then I'm back to my question. In a world in which finding somebody with an outstanding arrest warrant was an extremely low probability, you would be right. In a world in which it was an extremely high probability, you would be wrong. Then it seems like where is this on the spectrum? What do we know about that? It sure seems – I mean, again, I will come back to this. I was surprised beyond measure by how many people have arrest warrants outstanding, and particularly in the kind of areas in which these stops typically tend to take place. So that, it seems to me, you know, is a pretty strong argument for why this will increase deterrence. What Your Honor – again, I think, Justice Kagan, the answer to that is the inquiry here in attenuation is not just is there an intervening circumstance. Under this Court's prior cases, there still must be something else. And we think that something else, following from this Court's teaching in Brown, is a flagrancy inquiry. What level of culpability does this conduct display? Kennedy, do you think that something else includes a subjective component, whether there was a purpose to see if there was a warrant? We don't, Your Honor. We think that that inquiry is inconsistent with the way this Court's Fourth Amendment jurisprudence has evolved. It's an objection. So it isn't flagrancy? It is true that that would be a step maybe beyond our cases. On the other hand, if the inquiry is one of flagrancy, then maybe that's necessary. And it may be particularly necessary here, because under the line of questioning that Justice Kagan just concluded with you, it would seem odd for this Court to say the higher crime – the more it's a high-crime area, the less basis you have to stop. That's very odd. Well, I think, Your Honor – So it seems to me that the subjective purpose component might serve an important purpose here. So that a police officer can't just say, I'm going to see if there's a warrant for this fellow. That's the reason I'm going to stop. That seems to me quite wrong. Well, Justice Kennedy, I think the answer to that question is that in the cases upon which Respondent relies, citing the subjective purpose requirement, those have all been cases involving arrests without probable cause. And in those circumstances, the factors and the facts that we think this Court discussed in those cases go to show the objective unreasonableness of those particular actions. We think it's different in the context of a Terry stop, where this Court has repeatedly said courts can make the stop in order to investigate, in order to confirm or dispel suspicion. And that's particularly so, Your Honor, with relation to the two-part test that we think this – that we think is appropriate here, where the intervening circumstance is a preexisting warrant based on probable cause arising from facts completely unrelated to the stop. That type of intervening circumstance matches up precisely with what this Court found in Johnson v. Louisiana, where the intervening circumstance there was a commitment  Sotomayor, this is a non sequitur. When you talk about an intervening circumstance, as we've looked at it in the case law, it's always been something different than the actual stop. Another police officer comes by and says, oh, I've been searching for that guy. I know he has – I have an arrest warrant for him. A witness walks by on another crime and says, he just robbed me down the block. Those are intervening circumstances because they are something outside of the stop. But this location of evidence was a direct product of the stop. It would never have happened except for the stop. Fisherman, Your Honor, we agree that there is but for cause here, but with respect there was actually something else that happened here. That was that prior finding of probable cause by a neutral and detached magistrate on a crime completely unrelated to the facts at issue in this particular stop. So in that sense, it does resemble precedence. Sotomayor, you know something? Finding the baggie of cocaine gives the officer probable cause to arrest, but we don't let that cocaine come into evidence merely because it was a ground for the arrest. We look at how the evidence was secured before deciding whether it's suppressible or not. And I don't see how this is any different than not letting someone be arrested or suppressing DNA evidence, fingerprint evidence that leads to other crimes. We've suppressed those things because they've been the product of an illegal stop. And, Justice Sotomayor, we agree with you that if the bag of cocaine or if an officer had found a bag of cocaine during an unlawful stop, that's the precise situation where the exclusionary rule would usually apply. What's different here is that the search in which the drugs and the other evidence was found occurred while the suspect was in lawful custody. Respondent has admitted that the arrest warrant was lawful, and the arrest was therefore lawful. And under this Court's decision in Robinson, once the arrest is lawful, the search incident to it is lawful, and all the evidence gathered in any search is lawfully seized. Ginsburg. If you're going to make a statement in reply brief that says the Fourth Amendment does not require officers to have reasonable suspicion before they check for warrants, if you mean that, then any officer can say, what's your name, I'll check you for a warrant. An officer could do that, Your Honor. That's certainly right. But what happened here is that, of course, that request came during the course of a stop that we've conceded was not supported by reasonable suspicion. And so the question is, what happens? Ginsburg. But you say they didn't need reasonable suspicion. I mean, as I read the sentence, it says the officer doesn't have to have reasonable suspicion. It can grab you, what's your name, and check for warrants. And that doesn't violate the Fourth Amendment. Gershengorn Justice Ginsburg, they don't have to have reasonable suspicion to check for warrants, but that's different from making the initial stop, where, of course, they do need reasonable suspicion. If there are no further questions, I'd like to reserve the remainder of my time. Roberts. Thank you, counsel. Mr. Bash. Mr. Chief Justice, and may it please the Court, I'd like to start with the concern that Justice Sotomayor and Justice Kagan have both raised about these communities where there are a lot of outstanding warrants. As a preface, there's a lot of communities where there's not a lot of outstanding warrants, and the rule that Respondent wants you to establish would exclude evidence of serious guilt and serious offenses nationwide. But focusing on communities like Ferguson with a lot of outstanding warrants. Why are they getting away with anything? What's being excluded is evidence of the crime that was found. Of another crime that the police would never have found, but we do that. Well, they might have found it during a separate valid execution, a separate execution of the warrant without a preceding Terry stop, but the evidence found on a person, for example, a firearm, can be very serious crimes that are also of significant danger to these communities. But that's true of all evidence we suppress. Now you're attacking our suppression jurisprudence. We understand there's a cost to suppressing evidence, but we believe, as we've been taught by our precedents, that there is value in ensuring that the Fourth Amendment is respected. Of course. And the overarching inquiry always is weighing those very serious costs of excluding evidence of guilt against the deterrent value that you would get from the claim that's here. So what's our rule now? Now you don't need reasonable suspicion to stop someone. You only need questionable reasonable suspicion to stop someone. And now, so we've now lessened the standard, the Terry stop standard, which is fairly intrusive to stop someone. I suspect, and I don't know whose brief it was, yours or your or Petitioner's, but someone said the public will stop this if they don't like police stopping you with no cause. I think the public may end up stopping things, but in a way the police are not going to like. Well, Justice Sotomayor, we're not talking about all Terry cases. We're talking about a class of Terry cases where an intervening event of huge legal significance occurs. It turns out that a neutral magistrate had already found a probable cause to arrest this person. So we're certainly not talking about lowering the Terry standard in all cases. But we're not saying that the statistics, Mr. Bash, could you do that? And does the United States know the percentage of residents of the United States who have outstanding warrants? We don't know globally. In the reply brief of the Petitioner in this case, he cited a study submitted to the Department of Justice in 2004 that looked at two counties. I don't pretend they're representative, but it's a county in Minnesota and Maryland. And it was an extremely low number of warrants per person. And of course, using that number would take the assumption that every warrant is for a different person, which is probably not true. And it would assume that the population reflects the total number of people who could be subject to warrants. But of course, people pass through, people come in and out. So it's probably extremely low. I do take Justice Kagan's point, though, that there are some communities where the warrants are high. I want to focus on that. Alito, and what should we be concerned about there? What would prevent the problem in communities like that? Well, it's important to know that Respondent's rule does nothing to solve the problem that the Department of Justice in its March report, March 2015 report on Ferguson identified. What was going on in Ferguson is that the municipal court, in conjunction with the police, were using arrest warrants as a revenue-raising measure. They were issuing warrants for very minor offenses and failure to appear. And then police officers on the scene had the incentive to arrest people to bring them in to pay the fine. Respondent's rule does nothing to solve that, because everybody agrees the arrest is lawful. The Department of Justice did not find, even in a community with a significant number of arrest warrants as Ferguson, that officers had an incentive to search and that they were acting on an incentive to search people incident. The incentive was to arrest and pay the fine. Respondent's rule does nothing to solve that. Kagan. Kagan. Kagan, I take the point, Mr. Bash, but I guess I just don't understand. Of course, this is a nationwide rule that we would be setting, but most Terry Stops do not happen in most neighborhoods. Most Terry Stops happen in very high-crime neighborhoods, appropriately, but where people have lots of arrest warrants. And you might be right about the specific Ferguson case, but I still have my question, which is, why doesn't that dramatically change the incentives for police officers in deciding whether to search somebody? If you know that there's a significant possibility that somebody you stop is going to have an arrest warrant, that's another reason to stop them. Justice Kagan, I don't think the empirics show that the numbers are so great that even in high-crime neighborhoods, at least outside of the Ferguson circumstance where you have this odd revenue-raising scheme, that the chance of both finding a warrant and then finding contraband in the search incident arrest is so high that it's incentivizing officers to conduct illegal stops solely for the purpose of finding a warrant. That was my point about the importance or the likely importance of purpose in this analysis. I was actually just going to turn to that, Justice Kennedy. I think when this Court has mentioned flagrancy in cases, not only those cases listing the brown factors, but also cases like Leon and Herring, what it has been concerned about in part is the notion that once you establish an attenuation principle, what I would say is a common-sense principle here, that generally an arrest warrant should be a superseding cause of the discovery of the evidence, you might have an officer exploiting that rule precisely in order to get evidence in search's incident to arrests. So I think the way you could think about flagrancy is, did this officer have the purpose, and it could either be a purpose objectively understood from all of the facts, or it could be a subjective purpose, to exploit this attenuation exception precisely in order to search incident to arrest. I don't think the facts here remotely get there. I don't really think even Respondent has argued that. This was a legitimate investigation. The officer may have made a mistake about the quantum of suspicion necessary. But if you had a case where an officer truly, either objectively or subjectively is going out, just pulling random people over because he now knows about this attenuation rule established in this case, I think that's the sort of flagrancy consideration in cases like Leon and Harry in this Court has left as a safety valve. Kagan. But does that mean that we're going to have to, in every single case, explore the officer's subjective motivations? Because that sounds like the kind of inquiry that we've tried to stay away from in the past. Justice Kagan, Justice Kennedy suggested subjective motivations, and I think that has some support in the earlier attenuation cases, like Brown and Dunaway and Taylor, where it really did seem to be that the Court was inquiring about purpose. And it also has some support in doctrines like inevitable discovery, which does ask, you know, what were you going to do, in fact. In more recent cases, the Court has moved towards an objective test. So I think the way the Court could formulate the flagrancy safety valve in this case is to say, does this stop appear objectively designed to exploit the ability to search incident to arrest on a warrant? And it could look at all the circumstances. It could look at the fact that this wasn't incident to any legitimate investigation. It could look to the fact that the officer pulled over several people and searched them for warrants in the same incident. I think it could have that safety valve, which would have the effect of preserving cases like this one, where an officer is acting in good faith and someone is found with very serious evidence on them of drug trafficking or a firearm. And it would make sure that those cases are not subject to that safety valve. Sotomayor, we've gotten to the point where we no longer have reasonable suspicion at all, because you keep defending this stop. And I keep going back to he has an anonymous call, he does see a certain number of short stay visits, but he stops someone who he doesn't know has been a short stay visit, has not seen there before, knows nothing about this person, and is doing a complete intrusive stop, not just a, hey, will you talk to me stop, but a formal investigatory stop on nothing else. Just a sort of respect for that, I think this was a close case, and I'll just lay out why. Maybe you'll disagree with that. This was an officer with 18 years of experience and several years or a couple years in drug crimes, got an anonymous tip that this was a drug house, observed it intermittently for 3 hours, and saw short-term traffic that was consistent in his experience and expertise with drug activity. And then someone walked out of the house. That person could have been one of two people. He could have been a short-term visitor, in which case I think most people would agree that there would be cause to stop, or he could be a long-term resident of that house. And there's not too many houses that are involved in a long ongoing drug trafficking or drug sales that a long-term resident of that house wouldn't know about. I mean, this wasn't a pizza delivery man. This was some of the. Ginsburg, it's a given that there was no reasonable suspicion, and you can argue whether it was. But for our purposes, there was no reasonable suspicion. As the case comes to the Court, that is correct, Justice Ginsburg. My only point was this isn't the example, in my mind, of the safety valve flagrancy situation that I was discussing with Justice Kagan and Justice Kennedy. I think that's the reason that this case comes to us is because the Utah Supreme Court says, you know, this is three things, and flagrant, this is all very confusing, and courts are coming out all over the lot, so we want to come up with a simpler test. Do you have or are you saying Utah was wrong, the three-prong test that we have now is fine? Would you change in any respect how we look at these attenuations? Well, I don't think the three-prong way is a bad way to look at it. The cases have actually used the three prongs to determine whether a defendant's confession is the product of free will. Mr. Chief Justice, can I finish? We think it's a fine way to think about this case in the sense of the Court could hold superseding legal authority by a neutral magistrate is an intervening event of significance for the attenuation analysis, and suppression would be appropriate only if the stop was flagrant, either objectively or subjectively understood. Thank you, counsel. Ms. Watt. Mr. Chief Justice, and may it please the Court, Utah's proposed rule would open the door to abuse. It would create a powerful incentive for police officers to detain citizens without concern for the Fourth Amendment, knowing that finding a warrant would wipe the slate clean and render the constitutional violation irrelevant. It would cut the heart out of Terry. It would create a new form of investigation. Officers would be stopping citizens and hunting for warrants. It's already the practice in many communities, and if Utah's rule is adopted, it will become the norm. It's unnecessary for this Court to take such a sweeping view as Utah has. Alito, would that be true if, let's say, one-half of 1 percent of the residents of South Salt Lake or Salt Lake City have outstanding warrants? The statistics are important to our argument, but not necessary, because even without the statistics, we know that officers make stops precisely for that reason, to find the warrant. That's why they're making the stop. They can target communities. And so even if there's just a very minor amount of warrants, they can still target communities that may have a greater incidence of warrants. And if this were the rule, there would be no downside. Officers would not make a stop. Alito, would that be true if, let's say, one-half of 1 percent of the residents of South Salt Lake or Salt Lake City have outstanding warrants?   And if this were the rule, there would be no downside. Officers would not make a stop. Alito, would that be true if, let's say, one-half of 1 percent of the residents of South Salt Lake or Salt Lake City have outstanding warrants? If I were to find a warrant today illegally, then I'm going to find one who has an outstanding warrant, you would say that that gives the officer the incentive to make those 199 illegal stops? Well, it's still precisely why the officer would be doing it. He's running the warrant check. In this facts situation, we're talking about a very narrow set of facts, where we have an officer that detains someone, and as part of that detention, there is a warrants check. These were not separate things. It was inherent in this stop. And so, yes, if an officer is detaining someone under those circumstances and runs a warrants check, he's doing it precisely. Could you — is it permissible to do a warrant check as part of a lawful Terry stop? A lawful Terry stop? Yes. We've — in our brief, we've referred to Rodriguez, and this Court has certainly said that, at least in the context of automobile stops, yes. Well, in this case, the State, as I understand it, please correct me if I'm wrong, has conceded that the stop was unlawful. It has not conceded that it was flagrantly unlawful. Isn't that correct? Well, that's right. That's right. And so what — but what the position that the State has taken is — So we take the case as one in which there was no — there was no flagrant conduct? There — the — so the test under Brown for flagrancy really has two elements. One is whether it was done deliberately or purposefully. And we know from Dunaway and Taylor and Brown itself that — that unlawful conduct that is undertaken with the purpose or with the hope of finding something, with the hope that something turns out up, is deliberate and is flagrant. And — and Dunaway tells us that we don't need some overarching flagrancy, that that's enough. And so the purpose is important. It's viewed from an objective standpoint. Here we have an officer that told us his purpose. But objectively, we do look at purpose. We look at justification. That's how we know the limits of a Terry stop. But what's the number? What percentage of people have to have warrants before you can imply that whenever an officer stops someone, it is to, you know, illegally search them because they're very likely to have an arrest warrant? Well, I think that the proper focus — I mean, I don't think breaking it down to numbers is the way to go. I think the proper focus is on deterrence. And we know deterrence is not just — Well, I suppose that's related. I mean, your brief had a lot of numbers in it. And if only one out of a hundred people have arrest warrants, then I think you really couldn't imply that that was the purpose of the stop. And some of these numbers, obviously, you have in particular communities high numbers, but some of them didn't strike me. I was surprised how low they were. 323,000 is a big number, but that's the entire State of Florida. So the officers run warrants because — warrants checks because they're likely to turn up warrants. With — when they target certain — Why is that? Do you mean every time a police officer pulls somebody over and runs a warrant check, it's because he thinks it's likely there's a warrant? Might it be to protect him when he walks up to the car? He'd like to know that the person is wanted for murder, right? So running the warrants check tells him that. That's — when you run the warrants check, you're looking for a warrant. In this case, that's what Officer Frackrow was doing. He wanted to try to find out something about Mr. Strieff, and so he ran the warrants check. The — these kinds of stops, it is — But I guess, I mean, you do require us to determine whether or not he ran the warrant check to ensure his safety in this interaction or as an investigative matter. I mean, does that make a difference? In — he — it makes a difference in the sense that when there is a stop that is made, that the warrants check is inherent in that stop. So I guess my answer is no, it doesn't make a difference, because when the warrants check is inherent. Why wouldn't it? Now, look at our case, Rodriguez's case. We assumed that the check there was to ensure the safety of the officer. That's right. All right? Right. If the stop here is purely investigatory, isn't that different? Can you have an investigatory stop based on no suspicion? You were right when you said he stopped to check for the warrant. The question is Justice Kennedy's question, which is, is that legitimate? Can you have an investigative stop to check for a warrant without reasonable suspicion or with? Without. Without, you cannot. You cannot — the officer cannot detain someone without reasonable suspicion to run a warrants check. Alitoso, as I understand your position, you don't argue that the arrest was unlawful. Is that right? We don't. We have never challenged that. So the arrest was lawful, and when the officer is making the arrest, it's permissible for safety purposes for the officer to frisk the person who is being arrested. Do you agree with that? Yes. So it's an — so it's a lawful search, correct? We've never challenged the search. Isn't it — can you give me one other example of a situation in which this Court has held that the fruit of a lawful search must be suppressed? I don't have another case in this precise circumstance. Our position throughout has been that this case has not come before the Court. We know that an arrest warrant is not always an intervening circumstance. It wasn't one in Taylor v. Alabama. And even Utah and the Solicitor General don't take the position that just the arrest and the search incident to arrest are enough, because they've conceded that dragnets — that any evidence that's found in a dragnet is a fruit. And so that's a— Alito to suppress the fruit of a lawful search, and maybe you need strong circumstances to justify such an unusual and unprecedented result. Well, our position is these are strong circumstances, because part of deterrence, the value of deterrence is found in the strength of the incentive to violate the Constitution. And the opposite is true. Could you — could you — go ahead. Ginsburg He said, you don't question at all the arrest, and you don't question, once there is an arrest, the pat-down for drugs. I mean, the pat-down for guns. But are you saying that the arrest for the warrant, that has — is a totally different crime, doesn't permit you to search for evidence, it only permits the officer to protect himself by patting down for weapons? Is that— Well, our position is that anything that's found is the fruit of that — of that illegal detention, not of the arrest, because the — the arrest and — and ultimate — and subsequent search are — are a fruit, but — but they're not suppressible. They're not something that we have fought against, because, again, we have the warrant and authorization. But if the individual is going to be arrested and put in jail, isn't it standard procedure and lawful procedure for the authorities to search that person thoroughly? They couldn't have the person bring drugs into — into the jail, or things that the person might use to hurt himself or other people? It would still be a fruit. So it would — well, what does that mean? It's — but it's not — that does — that's lawful conduct on their part, right? Right. Okay. But so you're asking for the suppression of the fruit of a lawful search. What we're asking for is the suppression based on the unlawful detention that began the encounter. So — so this encounter begins with the stop. The stop itself is — is unlawful. The State has conceded that throughout. So what's — what's the problem with that stop? This is a stop, the kind of stop that lawyer — or, I'm sorry, that officers are faced with every day. It's a basic kind of stop. It — what — what do we know about Terry stops? The officers have to — have to have a reasonable articulable suspicion. Cortez tells us that it's really a two-step assessment. They have to, number one, look at the totality of the circumstances, and number two, they then have to look at whether there's an individualized suspicion. Does this tie in with this defendant? So in this case, what does the officer know? All he knows is that there's some short, not terribly frequent, short-stay traffic at the house. He sees my client emerge from the house, knows nothing else. So even under the totality, a reasonably well-trained officer should have known this stop was not — was bad. So — But you're arguing something that the State's conceded, right? Well, I think it's important because the State has taken the position that — that this was just a factor too shy of — of what was needed. And being a factor too shy of Terry leaves us with nothing. Terry is already a fairly low standard, but it's a— But you still have to say that it's flagrant. Well, my position is — is twofold. One, that — that flagrancy has two aspects. One aspect is just the deliberate aspect, and that in — in this type of a stop where — where it's made for the purpose of — of running the warrants check, the warrants check is inherent in the stop, that that's enough. But secondly, if we were going to include a different definition, it would be that it was blatantly unconstitutional. And so that's why I'm moving into the stop to talk about what was the problem with this stop, what do we expect of our police officers, what do we need from our police officers. You said that the stop was made for the purpose of running for the arrest warrants. I just don't know the basis for that, other than your statistics, that in certain areas there are a high number of arrest warrants. In many areas there aren't. I mean, is it entirely empirical? Do we have to accept and generalize from your empirical evidence which — that the purpose must be to execute or to check for arrest warrants? No, because we know that that's precisely what — what was done in this case, what is done in some other cases. In this case, we have an officer that makes a stop and he immediately runs that warrants check. How does he do that? Roberts No, but he immediately runs the arrest warrants check when he makes the stop, because he wants to know who he's dealing with. It would be, I think, bad police work to not run the warrant check until after you've had an interaction with the person when the danger that you could have found out about might have been when it's too late to act on it. The way he finds out who he's dealing with is if there's a warrant. The point is he didn't have a reasonable suspicion to stop my client. And so the court to run the warrants check No, I understand that, but you're implying — I'm still trying to get at how you decide what the purpose was. In your brief, you say several times, oh, the purpose is to run the warrants check. And I just want to know why that's the case. Because it was immediate, it was inherent in what he did, because he stated that his purpose in stopping my client was to find out about the house, and that it was normal for him to run a warrants check, and normal for him to want to know who he's dealing with. So we now have a new— Roberts, that's saying that the warrant check is something he does when he arrests people. I don't doubt that, but it doesn't prove that that was his purpose in the stop. So the intended consequence of running a warrants check is to find a warrant, number one. And number two, our statistics show that in a sizable number, it's — officers are likely to find warrants. The other concern is, if you find— You're asking us to say that as a matter of law, you want us to hold that the purpose of this stop was to run the warrants check? I thought the purpose of the stop was to find out what was going on in the house. I think that when an officer— The record just doesn't support the first proposition that I made. When an officer detains someone as part of a fishing expedition in the hope that something will turn up, that is — that is the purpose that is a problem. There was no suspicion here. He was — your client wasn't frisked. I'm sorry, wasn't frisked? No. There was no activity that the officer is alleged to have seen that would put the officer in fear of any — that this gentleman was violent or was going to turn on him or do anything else. Correct? Correct. So the purpose, as I understand what you're trying to say, is he is now routinely checking every single person that he stops, whether with or without reasonable suspicion. There can't be any other reason other than he wants to find a warrant or not. But that's — so part of the stop may be to investigate, but the other part of the stop is he's doing this routinely with no reasonable suspicion, with no articulable fear of his — for his own safety. He's demanding people's names, and he's running a warrant to do what, you're saying, to find the warrant? To find the warrant. Exactly. How often are cars — people stop driving and an officer walks up to the car and they're shot? Does that happen a fair amount of time? It does happen. It does happen. So is there no other reason for checking to see if there are warrants out for that person before you walk up to the car or before you conduct an inquiry with the ticket? It seems to me not wanting to get shot is a pretty good reason. But this presents a completely different scenario. This officer approached Mr. Streiff. He knew very little about him. You know, as a matter of deterrence, a reasonably well-trained officer would have known, should have known, that there wasn't enough there, because he didn't know anything about my client. There was no individualized suspicion. And we really don't know very much about exactly what happened here, which is unfortunate. But what the officer testified was, he didn't just grab this guy and say give me I.D. and then run a warrants check. He did say that he approached him and he said, identified himself, he said he thought there might be drug activity going on in the house, and he asked him to tell, he said, I asked him to tell me what he was doing there. Now, we don't even know what he, unless I'm someplace else in this record, we don't even know what your client said. But he could have said, what am I doing there? Yes, I live there, or my mother lives there, or my best friend lives there. But whatever, we don't know what he said. But then at some later point, he ran a warrants check. So how can we infer from that that the whole point of the stop was to run the warrants check? So a really important part of the officer's testimony was that he didn't remember what that answer was. So if my client had said, I went in there because there's someone who's ill and I've been visiting for, you know, 20 minutes, or this is where my friend lives, that's why I was there, end of inquiry. And the warrants check shouldn't have been run. A reasonably well-trained officer should know. The important part of this case is that if we're only looking at we're not just looking at deterring Officer Fackrell. We're looking at deterring future conduct by officers. And the Terry limitation is something we want our officers to know. It's fairly straightforward. This is a fairly straightforward case that is going on every day in this country, where officers are looking at houses, watching houses that maybe might have drug trafficking going on. They're trying to establish probable cause. Case law is relatively clear about what you need to get probable cause on a house. It's also relatively clear about what you need to get individualized suspicion. We know from Cortez we need those two elements. We also know from Ibarra that just being in proximity to other people is not enough. Being around, even when the officers have probable cause to search or probable cause to arrest someone, if you're standing right there, it's not enough. So it should be clear to an officer that my client leaving a house that he doesn't even have probable cause on, that he's trying to find something out about. Sotomayor, Well, all he did was go from the house to a convenience store, not in a car, but walking. He walks to a convenience store. He stopped in the parking garage, but without a car. And I go back to, this is not coming up to a parked automobile and getting shot, correct? Right. Right. Would your rule apply in that situation? Well, when an officer makes a stop of an officer's car. Would your rule apply in a situation where the officer approaches the car for a purpose that is later found to be insufficient under Terry? You would suppress whatever evidence is found in that situation, too, right? If the officer did not have a reasonable suspicion for the stop. Okay. So it would apply in the stopping of the automobile situation? It would. But again, in these cases, if there is a warrant, we haven't argued about the warrant itself. What we've argued – our concern is the random stops. And our concern is not just for my client. It's for all of those innocent citizens that are walking around, that are stopped, that a warrants check is run, and nothing comes up, and then they're sent on their way. There's no oversight. The officer is encouraged to engage in a catch-and-release type of approach with our citizenry. And Utah's rule would be something that would create that incentive. In your brief, you took the position that an event is intervening only if it is unforeseeable. Well, our position is that an intervening circumstance needs to be independent, and it needs to be a break in the causal chain, and that when a warrant is run – and it needs to be something that is not directly related to the officer's conduct. And so because the warrants check is an inherent part of the detention, it's not an intervening circumstance. And that's something that the Utah Supreme Court unanimously agreed with, and the dissent in the Utah Court of Appeals as well, agreed that this is – it's a natural and foreseeable consequence. It is the intended result. It is not something that is independent, that comes as a surprise. And that's really consistent with this Court's case law in dealing with intervening circumstances. Spontaneous confessions are something that are independent. They break the chain. We look at free will, and that's independent and breaks the chain. Witness testimony. But here, there was no break. It was a direct result of the officer's conduct. The rule that we are really asking the Court to adopt follows settled exclusionary rule case law, and that is that if there is the bad stop, it's suppressed unless there is attenuation. And of course, if there hadn't been a warrant, if the officer had just stopped my client and searched him, I don't think anyone is contesting that that would just simply be suppressed without attenuation. And in this case, there was no attenuation as well, because all three of the factors that this Court has looked at work in favor of suppression. The temporal proximity works with us, obviously. It was contemporaneous. It was immediate. It was inherent. It's not an intervening circumstance because it's not independent and it's not a break in the causal chain. And it was deliberate conduct on this officer's part that was blatantly unconstitutional. Roberts. Roberts. You disagree with Judge Friendly's analysis in the Friedland case? In what respect? Well, with his analysis, because as I understand, it took the position opposite to what you are arguing. And I just want to know if you have a basis for distinguishing that precedent. I guess I don't. So our position is that this falls squarely within the Court's settled case law. We are asking that the Utah Supreme Court be upheld. You agree that attenuation is based on deterrence, that the attenuation determination is based on a calculation of the deterrent effect of the ruling? I do. I do. I agree that the focus is on deterrence. And I think that in this circumstance, there's powerful deterrence to adopt our position and to not follow Utah's position. If Utah's position is adopted, part of deterrence is looking at the incentive  of the rule, and under Utah's rule, there would be nothing to stop police officers from stopping people on the street, articulating something, Terry doesn't take much, most officers can articulate some sort of justification, looking for the warrant and then sending people on their way. So we believe that deterrence would be very well served by adopting our rule. And your deterrence argument doesn't depend at all on statistics? Even without the statistics, our deterrence argument works, because the point is a reasonably well-trained officer would or should know what the parameters of Terry are. This officer did not. So if one in a thousand people has an outstanding warrant, that's enough? So that statistic wouldn't upset your argument? It wouldn't upset my argument, because we run more – officers run warrants checks because they're likely to find them. One in 10,000, would that upset your argument? I suppose – I've got to get to a number of what you're going to say. In those communities, then you're going to see much less of this behavior, you know, much less of the running the warrants check in order to find a warrant. It's going to self-correct. But for the most part, I mean, and the flip side is there's then no reason not to run them if that's the rule. But for the most part, in most communities, the incentive there – the other thing is, with Utah's rule, it could create an incentive to have even more warrants for even more minor infractions. This was a traffic matter. Many of these warrants in the cases down below are minor traffic matters. That it would be – But what was it? Was it a ticket?  It's not in the record. It's not in the record. But it was referred to as a minor traffic matter. Do you think the judges in the traffic courts are going to start issuing lots of warrants because they want to provide a basis for randomly stopping people? My point is only that it creates an incentive to not be as careful. It creates an incentive. I'm very surprised that Justice Alito doesn't know that most of these warrants are automatic. If you don't pay your fine within a certain amount of days, they're issued virtually, automatically. Right. And that's exactly what this one was. So it doesn't create an incentive of the kind you were arguing you were worried  I'm sorry. I don't know. The warrants are automatic. You were suggesting that, oh, one thing that will happen is they'll be issuing all these warrants if they know they can get evidence from illegal stops. And because the warrants are automatic, they're not going to be issuing all these warrants, are they? They're automatic in certain circumstances, and those circumstances would increase. So they're automatic right now for no insurance or for speeding. They would increase, and they'd be automatic for infractions. And the other aspect is the databases and the incentive to keep those databases accurate and up to date. It's our position that this absolutely plays into a deterrence and that Utah's rule would have an overwhelming impact that would create a powerful incentive for police officers to walk up to people on the street and simply stop them. We're asking, unless there's further questions, that the court affirm the Utah Supreme Court. Thank you. Thank you, Ms. Watt. Mr. Green, you have four minutes remaining. Green, you have four minutes remaining. Thank you, Mr. Chief Justice. If I could just make three brief points in response. First, to the suggestion that officers make random stops in order to find a warrant to conduct searches of this type. There's actually no evidence of the record, in this record, that that's what happened here or that it happens more broadly. In fact, I think the opposite is true. If you look at page 18. Sotomayor, I'm just saying practice to run warrant checks. Every stop, legal or illegal, he says it's he runs warrants. It's on the street or in a car, meaning that's what the police officer testified to. He runs them, Justice Sotomayor, for the purposes, I think, that have been discussed today for safety rationales and other reasons, but there's no actual evidence that he runs them. So we now have a new rule. We've taken running warrants for traffic stops that we've thought were legitimate because they had to do with highway safety. Now we're saying to police officers, run warrants on any name you get, because all you have to do is wave the flag of safety. No, Your Honor, that's not what we're saying. We're saying that there's a safety rationale for the warrant check, but beyond that, there's also the important flagrancy safety valve that we've talked about here. And with respect to this particular warrant check, on page 101 of the appendix to our petition, there is actually a finding from the district court that the reason that this officer stopped this particular defendant was on suspicion of drug possession or distribution. It wasn't for something else. So that finding is here. And more broadly, this rule, as we've noted in our papers, is in fact the majority rule among the courts that have addressed this issue throughout the country. In the United States, excuse me, in the Seventh Circuit, the case of United States v. Green was decided in 1997, almost 20 years ago, and that, of course, involves states with a large number of metropolitan areas, Chicago and Milwaukee and Indianapolis. And there's no evidence in this record or before this Court that these sort of random stops in order to check for warrants is happening in those jurisdictions. So we think the actual practice and the way it bears out and has borne out in areas where this has been adopted undermines that particular argument. And second, Your Honor, with respect to the question of whether a subjective purpose should come in responding to Justice Kennedy's question to this inquiry, I think if this Court were to do that, it would become an outlier of sorts in the case, in this Court's Fourth Amendment jurisprudence. And I think with respect, if it remains an objective inquiry and consistent with the rest of this Court's cases, that objective inquiry will capture the flagrant cases. We've cited four cases from four different State courts in our reply brief, a footnote one of our reply brief, that's Illinois, Missouri, New Jersey, and Oregon, where the courts that have applied this rule have undertaken the flagrancy inquiry and have, in fact, suppressed evidence because the initial stop was flagrant. Finally, a third point, the — as we've noted in our briefs, Your Honor, the Respondent here has abandoned the Utah Supreme Court's rule that an intervening circumstance must, in fact, be something attributable to the defendant's own free will. We think that's appropriate based on that concession, that it would — that this Court should reverse the judgment of the Utah Supreme Court. And it leads to the question, of course, of what rule to adopt instead. And we think, Your Honor, this intervening circumstance here, this arrest on a pre-existing warrant that arises from probable cause based on facts completely unrelated to the circumstances and the facts of this stop, is exactly like what happened in Johnson v. Louisiana, which is the case that this Court pointed to in Brown v. Illinois, where it adopted and said the intervening circumstance is critical to the attenuation inquiry. It's a straightforward application of that particular test. If there are no further questions. Roberts. Thank you, counsel. The case is submitted.